IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, SOUTHERN DIVISION

```
UNITED STATES OF AMERICA    )
                            )    CRIMINAL ACTION NO.
      v.                    )      1:14cr417-MHT
                            )          (WO)
DERYKE MATTHEW PFEIFER      )
```

OPINION

This cause is currently before the court on the
government's request to have defendant Deryke Matthew
Pfeifer involuntarily medicated for the purpose of
restoring his competency to proceed to trial, pursuant
to Sell v. United States, 539 U.S. 166 (2003).  Pfeifer
has been indicted on one count of threats against the
President of the United States, in violation of 18
U.S.C. § 871(a).  The court has found, several times,
that Pfeifer is mentally incompetent to stand trial,
that is, he "suffer[s] from a mental disease or defect
rendering him mentally incompetent to the extent that
he is unable to understand the nature and consequences
of the proceedings against him and to assist properly
in his defense."   18 U.S.C. § 4241(d); see United

States v. Pfeifer, _____ F.Supp. 3d _____, _____, 2015 WL
4774875, at **1-2 (M.D. Ala. 2015) (Thompson, J.)
(outlining the court's previous rulings in this case).

Pfeifer has been in custody since he was arrested
on the charge almost 14 months ago.  For a significant
portion of this time, he has been committed to various
federal medical centers for evaluation and treatment.
Most recently, he was committed to Butner Federal
Medical Center to determine whether there existed a
substantial probability that, within a reasonable time,
he would regain the capacity to proceed to trial.  See
18 U.S.C. § 4241(d)(1).  Pfeifer's doctors have
concluded that, without the benefit of antipsychotic or
other medication, Pfeifer is not likely to regain
capacity to be tried.  However, because Pfeifer does
not believe he is mentally ill, he has refused to take
any psychotropic medication.  Given its interest in
restoring Pfeifer to competence so that its prosecution
can continue, the government has moved to have Pfeifer
involuntarily medicated.

2

The court held a two-day hearing on the matter. Because the court had recognized that the government's request presented an exceedingly difficult question that would bear on fundamental notions of due process, liberty, and privacy, the court appointed a guardian ad litem to represent Pfeifer at this hearing and to advocate for Pfeifer's best interests, in addition to and independent of Pfeifer's defense counsel. See Pfeifer, _____ F.Supp. 3d at _____, 2015 WL 4774875, at **2-18. The court also heard testimony from several doctors and from Pfeifer.

For the reasons explained below, the court concludes that Pfeifer should be medicated, even over his objection, according to the protocol set out below.


## I. SELL STANDARD

Individuals have a "significant" constitutionally protected "liberty interest" in "avoiding the unwanted administration of antipsychotic drugs." Washington v. Harper, 494 U.S. 210, 221 (1990). This liberty

3

interest can be overcome only by an "essential" or "overriding" state interest.  Riggins v. Nevada, 504 U.S. 127, 135 (1992).

In Sell v. United States, the Supreme Court articulated a standard to determine whether the government's interest in rendering a defendant facing serious criminal charges competent to stand trial was, on its own, a weighty enough interest to override the individual's liberty interest in avoiding unwanted antipsychotic medication.   The Court held the Constitution permits such an outcome "only if the treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the fairness of the trial, and, taking account of less intrusive alternatives, is necessary significantly to further important governmental trial-related interests."   Sell, 539 U.S. at 179.   To determine whether that threshold has been met, the Court set out a four-part test.  Courts faced with this question must determine: "that important governmental interests are

4

at stake"; "that involuntary medication will
significantly further those concomitant state
interests"; "that involuntary medication is necessary
to further those interests"; and "that the
administration of the drugs is medically appropriate,
i.e., in the patient's best medical interest in light
of his medical condition." Id. at 180-81 (emphasis in
original).  The burden is on the government to prove
each factor by clear and convincing evidence.  United
States v. Diaz, 630 F.3d 1314, 1332 (11th Cir. 2011).


## II. BACKGROUND

Pfeifer is charged with threatening to kill the
President, an offense that carries a statutory maximum
of five years.  See 18 U.S.C. § 871(a).  The government
alleges that the threats to President Obama were made
within the context of other concerning, and illegal,
behavior, though Pfeifer has not yet been indicted for
other criminal conduct.

5

The government alleges that Pfeifer placed several threatening calls to a Social Security Administration office and the Federal Protective Service Mega Center, both located in Michigan.  On those calls, he allegedly threatened to "blow up" a Social Security facility and harm its employees and, purportedly speaking as an agent of God, threatened Obama.  After some investigation, the Secret Service agents determined that Pfeifer was the source of the calls, and they located him in Alabama.  Because he had been arrested by local police on an unrelated charge of menacing (which had been lodged for allegedly threatening his niece's estranged husband with a gun), he was interviewed at the police department.[1]

---

1. Because Pfeifer has a felony record, it would be illegal under federal law for him to possess a firearm under 18 U.S.C. § 922.  The government has not yet charged Pfeifer with this crime, but it has notified the court that it is currently seeking a superseding indictment so that it may do so.

The government alleges that, during that interview, Pfeifer admitted to making the calls; said that God had told him that he (God) was going to destroy Obama and everything around him; and instructed the Secret Service agent to look at videos he had posted online. These videos allegedly depict Pfeifer speaking, alternatively, as himself and as "Jehovah God." In one video, he holds a handgun and asks the camera: "Do you feel the heat, Mr. Obama? Jesus is not playing with you. ... The constitution gives me the right to bear arms. Just to let you know that I ain't violent unless the police mess with me. I'm trying to be peaceful, even with you, Mr. Obama." In another video, he allegedly threatens Obama's family, members of Congress, and the police.

Pfeifer also described to the interviewing officer the motivation for his threats. As to his threats against government agencies, he allegedly expressed the belief that he is receiving about half the benefit that he deserves from the Social Security Administration; he

7

also takes issue with the classification of his benefit. Pfeifer expressed his belief that he has been followed and shot at and his home invaded by various government agents as part of a conspiracy orchestrated against him. He has repeated similar statements to the court on several occasions. As for the threats against Obama, the government alleges that Pfeifer has provided two separate explanations. First, Pfeifer believes that Obama--when he was an Illinois state senator--provided legal representation to him on a civil rights case that he had filed against the police. Pfeifer believes that he maintains an ongoing special relationship with Obama and that, as President, Obama should now be able to do more on his case. Evidence submitted by the defense indicates that Pfeifer may indeed have contacted Obama's senate office for legal assistance, but that his staff declined to represent Pfeifer. Second, Pfeifer takes issue with Obama's political stance on same-sex marriage; he believes that

Obama will be punished--specifically, killed--by God for his support of gay rights.

Pfeifer's motivation is substantiated by his belief that he is a prophet of God. As Pfeifer has explained to several witnesses who have testified before this court, any threat to Obama would come not from Pfeifer himself, but from God acting through him.

Since he has been in federal custody, Pfeifer has met with numerous mental-health professionals who have evaluated him on several occasions. Each doctor has honed in on the same basic symptoms and diagnosis: Pfeifer's thinking is dominated by grandiose, persecutory, and paranoid delusions characterized by hyperreligious tones; he has delusional disorder. These mental-health professionals have explained that delusional disorder, while related to schizophrenia, is much rarer in the general population and that it is also distinct in a few important ways that are relevant here. First, while people with schizophrenia often have bizarre delusions (that is, delusions that are

9

implausible and not based in ordinary life experiences), people with delusional disorder often demonstrate nonbizarre delusions. This means that the belief in question is plausible within the cultural context, but it is not based in reality. Second, many people with schizophrenia suffer from visual or auditory hallucinations that cause abnormal behavior. But people with delusional disorder can present as fairly normal when they are not focused on their delusional beliefs. However, the treatment for schizophrenia and delusional disorder is the same: both are treated with antipsychotic medications and both are resistant to improvement without drug therapy.

### III. DISCUSSION

The question presented here is whether the Constitution permits the government to administer antipsychotic drugs involuntarily to Pfeifer in order to render him competent to stand trial. In order for such forcible administration to be constitutional, the

10

government must show that, "in light of the efficacy, the side effects, the possible alternatives, and the medical appropriateness of a particular course of antipsychotic drug treatment," the government's interest is "sufficiently important to overcome the individual's protected interest in refusing it." Sell, 539 U.S. at 183.   Given this high threshold, "involuntary administration of drugs solely for trial competence purposes" may be permitted only in "certain instances," and "those instances may be rare." Id. at 180. Pfeifer's case presents one of those instances.[2]

---

2. In Sell, the Supreme Court explained that a court faced with the request to medicate forcibly a defendant for the purposes of restoring competency should first assess whether forced medication can be justified on other grounds that are "more objective and manageable," such as the purposes in Harper, 494 U.S. at 225-26, related to the individual's dangerousness while confined, or purposes related to the individual's own interests "where refusal to take drugs puts his health gravely at risk." Sell, 539 U.S. at 182.

Here, Pfeifer's medical team at the Butner facility indicates that Pfeifer does not pose a danger to himself or others while detained. Moreover, Pfeifer's (continued...)

The court will begin its analysis with the four-part test articulated in Sell.

### A. The Government's Interest in Restoring Pfeifer's Competence

#### 1. Whether an Important Governmental Interests Is at Stake

As a first step, the court must determine whether an important governmental interest is at stake. To do so, the court must balance the government's interest in bringing to trial an individual accused of a "serious crime" against any case-specific special circumstances that might mitigate that imperative. Sell, 539 U.S. at 180.

The concern here is ensuring that courts adequately recognize the government's interest in "protect[ing] through application of the criminal law the basic human need for security." Id. To expand on this point, the

refusal to take medication has not put his health gravely at risk. Therefore, the court concludes that no other ground for medication applies here.

Court in <u>Sell</u> cited a concurrence by Justice Brennan that discusses, at length, the government's "sovereign prerogative to put on trial those accused in good faith of violating valid laws." <u>Illinois v. Allen</u>, 397 U.S. 337, 347 (1970) (Brennan, J., concurring), as cited in <u>Sell</u>, 539 U.S. at 180. As Justice Brennan explained, "Constitutional power to bring an accused to trial is fundamental to a scheme of 'ordered liberty' and prerequisite to social justice and peace," and the government's interest in bringing a defendant to trial is important because it will ensure both that "lawful penal authority" will take precedence over vigilante justice and that the "power of condemnation" will follow rational, open, and non-arbitrary procedures. <u>Allen</u>, 397 U.S. at 347 (Brennan, J., concurring). In short, the government has an important interest in prosecuting violations of law to ensure that the instruments of justice will remain in the hands of rational, accountable public decisionmakers.

13

However, it strikes this court that, in this case, it is not only the alleged violation of law that threatens the "scheme of ordered liberty," but also the conduct that allegedly surrounded the offense. A veiled threat to the President packs a symbolic punch, but may not pose a very real risk to the President's safety or the public at large. By contrast, a direct threat to a government facility, and to government employees, or even an assault on a family member involving a firearm, is more distressing. Thus, the facts surrounding the crime as charged in this case against Pfeifer enlarge the seriousness of the crime.

Other courts have considered the conduct surrounding an offense in determining whether involuntary medication was appropriate. In a recent unpublished Eleventh Circuit case applying the Sell standard, for example, the appellate court considered not just the bare charge but "the facts of the instant case"--that is, that a defendant charged with a firearm offense was discovered to be in possession of that

14

firearm because he had threatened harm to law-enforcement officers--as relevant to the question of whether a crime was serious. United States v. Fuller, 581 F. App'x 835, 836 (11th Cir. 2014).

On the other hand, the context of a particular case may also lessen the government's interest in prosecution. If the defendant's refusal to take drugs voluntarily will "mean lengthy confinement in an institution for the mentally ill," or if "the defendant has already been confined for a significant account of time (for which he would receive credit toward any sentence ultimately imposed[)]," the "risks that ordinarily attach to freeing without punishment one who has committed a serious crime" may be diminished. Sell, 539 U.S. at 180. Put differently, when the defendant's incapacitation is the primary purpose of the prosecution, or if the broader societal objectives of punishment have otherwise been met, the need for a trial itself may be less compelling. Moreover, the government has a "constitutionally essential interest"

15

in ensuring a fair trial. If the restoration of
competency would in some way contravene a defendant's
due process rights, this also lessens the government
interest in pursuing forced medication. Id.

Pfeifer has already spent almost 14 months in
custody, a sizable portion of his expected sentence.[3]
And, if Pfeifer does not receive medication, it is
unlikely that he will ever become competent to proceed
to trial. This circumstance would allow the government
to move to institutionalize him indefinitely on
dangerousness grounds pursuant to 18 U.S.C. § 4246.
Indeed, the allegations, his failure to recognize his
mental illness or the need to seek treatment for it,
and the fact that his condition has not improved over
the time he has already been in custody indicate that
this outcome would be almost a certainty. But while
Pfeifer has been, and likely will be, incapacitated by

---

3. At the hearing, defense counsel explained that a
preliminary calculation of his Sentencing Guidelines
range yielded an advisory sentence of 24-30 months.

16

this confinement, the government's interest in
prosecuting someone who has allegedly threatened the
President does not begin and end with incapacitation.
Cf. United States v. Gillenwater, 749 F.3d 1094, 1101
(9th Cir. 2014) (explaining that, for a defendant
accused of threatening government officials, "the
government is seeking to protect the very integrity of
our system of government"). Nor is the court aware of
any unavoidable reason why the government's request
would make the criminal trial unfair.

In sum, given the circumstances here, the court
does not find it difficult to conclude that Pfeifer's
alleged conduct, not only against the President but
also against government employees and his family
members, upset "the basic human need for security" of
those he threatened, Sell, 539 U.S. at 180, and that
the government therefore has an important interest in
bringing him to trial.

## 2. Whether Involuntary Medication Will Significantly Further the Concomitant Governmental Interest

Next, the court must determine whether "administration of the drugs is substantially likely to render the defendant competent to stand trial." <u>Sell</u>, 539 U.S. at 181. At the same time, it must determine whether "that administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair." <u>Id</u>.

As all parties have conceded, there is a relative dearth of reliable scientific studies documenting treatment outcomes for people with delusional disorder who receive drug-based treatment. This seems to be due in part to the ethical problems that arise with randomized, double-blinded, placebo-controlled trials involving people with serious mental-health issues, as well as in part to the rarity of the disorder and in part to the fact that the consensus of the medical

18

community has only more recently embraced medication as an effective treatment for delusional disorder. To the extent that some studies do exist, they are retrospective. One study discussed at length at the hearing, for example, found that 17 of 22 (77 %) incompetent defendants with delusional disorder had improved sufficiently to be restored to competence after being forcibly administered antipsychotic medication. A more recent study found that 11 of 15 (73 %) defendants with delusional disorder were restored to competency following involuntary treatment with antipsychotics. However, because of the small sample sizes and, moreover, because both studies were merely descriptive, they cannot be heavily relied upon to draw conclusions about future treatment outcomes.

Despite this fact, all of the doctors at the hearing testified with some degree of certainty that antipsychotic medication was often successful in treating delusional disorder. This degree of

certainty, however, varied based on the doctors' own personal experiences with treating the disorder.

First, Dr. Karl Kirkland, Ph.D., explained that, for a person who has suffered from untreated delusional disorder for a long time, his delusions may be so well-ingrained that even if he is successfully treated, he may retain some of these beliefs. But treatment may allow such a patient to distance himself from or compartmentalize his thoughts such that he can function without acting on them, even if he continues to hold the beliefs privately. And this often allows a criminal defendant who has been determined to be incompetent to reach a threshold of competence--that is, the defendant can understand the proceedings against him, and he can assist and cooperate effectively with counsel in preparing a defense. Ultimately, Dr. Kirkland concluded that a person with delusional disorder stands an 80 % chance of having his competence restored by medication-based therapy. However, because Dr. Kirkland typically recommends

treatment with serotonin agents (such as antidepressants and antianxiety medicines) before moving onto the antipsychotic drugs recommended by Pfeifer's doctors at Butner, Dr. Kirkland's estimate is of limited use here in assessing the treatment regimen as proposed.

Dr. Carlton Pyant, Ph.D., and Dr. Alton Williams, M.D., J.D., testified from the Butner facility. Both agreed that their proposed treatment plan--essentially, treatment with a first- or second-generation antipsychotic drug over a four-month-period--is medically appropriate for Pfeifer and necessary to restore his competence, and reflects current medical standards. Dr. Pyant testified that when the court authorizes doctors at Butner to administer an antipsychotic, they first make "every effort" to "establish rapport" and ask the defendant to agree to take the medication prescribed. If this fails, they move the defendant to the restrictive housing unit, and again "encourage him to go ahead and take it," backed

21

now by a "show of force."  Only if the defendant
continues to refuse will they "lay hands on the
patient[]."  Dr. Pyant could not remember the last time
that his team had to restrain a defendant in order to
administer such medication.  Sell Hearing Tr., Vol. I
(doc. no. 75) at 108-10.  Dr. Williams, the treating
psychiatrist, addressed specific pharmaceuticals: he
proposed starting Pfeifer on a second-generation
antipsychotic, Risperdal, if he agreed to comply
voluntarily with an oral administration of the test
dosage.  If Pfeifer did not agree to comply, Dr.
Williams recommended that they instead shift to one of
two first-generation antipsychotics, Haldol or
Prolixin, to be administered by injection.  Dr.
Williams explained that the likelihood of being
restored to competence on any of these drugs would be
the same; the differences, as relevant here, lie in the
method of administration and their side effects.
In Dr. Williams's experience--which includes 15 years
of training in a variety of hospital-based, clinical

22

and correctional-based settings--treatment of delusional disorder with antipsychotic medication is 75-80 % effective. And Dr. Williams was confident that success would be just as likely for Pfeifer.

Dr. David Ghostley, Psy.D., testified that he agreed that the recommended treatment plan was likely to render Pfeifer competent, but because he was not a psychiatrist he refrained from offering any specific likelihood of successful treatment, and deferred to Dr. Williams. When pressed, Dr. Ghostley ultimately guessed that someone with delusions as severe as Pfeifer stood a "50/50 chance" of being rendered competent to stand trial by medication. <u>Sell</u> Hearing Tr., Vol. II (doc. no. 76) at 78. Dr. Ghostley also testified that, if Pfeifer were forcibly medicated without success, his delusions were likely to become more deeply ingrained, because they would be based, at least to some extent, in reality.

Finally, all of the doctors agreed that the duration of untreated psychosis could affect the

23

likelihood of treatment: the longer a delusional belief had been operative on a patient's state of mind, the less likely it was to be responsive to treatment. But, while many of Pfeifer's delusions are based on events that he believes to have happened more than a decade ago, no party at the hearing offered any evidence as to how long he has been <u>delusional</u> about those events. Therefore, the court was not able to draw any conclusion from the expert consensus on this point.

In sum, there is clearly some ongoing discussion among mental-health practitioners regarding medication-based treatment outcomes for people with delusional disorder. But no doctor who testified at the hearing disputed the basic premise that treatment of delusional disorder with antipsychotic medication was at least <u>likely</u> to render an individual competent to stand trial. And in concluding that such treatment would be <u>substantially likely</u> for Pfeifer, the court relies most heavily on Dr. Williams's testimony, as he was both the only physician (that is, psychiatrist

24

rather than psychologist) who testified, and because he could draw on extensive experience in treating people with symptoms similar to Pfeifer's.

As to side effects, no witness gave the court any reason to believe that the proposed medication regimen would ultimately interfere with the Pfeifer's ability to assist his counsel in conducting his trial defense.

First, while Dr. Williams testified that sedation can be a side effect of antipsychotic medication, he suggested that dose adjustments can be effective in treating this problem. For the first-generation antipsychotics, side effects can also include movement disorders, muscle contractions, and muscular discomfort, though each of these effects can be managed effectively by other medication. More rarely, antipsychotics (and, particularly, first-generation antipsychotics) can cause tardive dyskinesia, a movement disorder that can be irreversible. This condition does not typically develop within the first six months of treatment; for patients with long-term

25

exposure to the antipsychotic drug, the risks can be managed by close monitoring and, as necessary, dose adjustments. For second-generation antipsychotics, the side effects are more likely to be metabolic syndromes and can be managed with non-medication corrective measures, such as nutrition counseling.

Having assessed and weighed the evidence, the court is convinced that the government's proposed medication regimen is substantially likely to render Pfeifer competent, without a significant risk that the side effects of those medications will impair his trial defense. In other words, involuntary medication will significantly further the government's interest in a fair prosecution.

### 3. Whether Involuntary Medication Is Necessary to Further the Governmental Interest

The court must also determine whether "any alternative, less intrusive treatments" are likely to achieve substantially the same results. Sell, 539 U.S.

at 181.   Moreover, the court "must consider less intrusive means for administering the drugs, e.g., a court order to the defendant backed by the contempt power, before considering more intrusive methods." Id.

The doctors who testified each agreed that no alternative, less intrusive treatment would be able to achieve substantially the same results.   For example, while several doctors testified that psychotherapy is often used in conjunction with medication therapy, no doctor testified that psychotherapy could effectively restore Pfeifer's competence on its own.   And, while Dr. Kirkland testified that people with delusional disorder can sometimes be treated with serotonin agents rather than antipsychotics, the Butner doctors testified that antipsychotics would be the appropriate course for Pfeifer.   The court thus concludes that there are not any alternative, less intrusive treatments that are likely to achieve substantially the same results as antipsychotic medication-based treatment.

27

The drugs proposed for Pfeifer's treatment are all available in oral administrations. However, for noncompliant patients, antipsychotic medication must be administered by injection. As Dr. Pyant described at the hearing, this means that Pfeifer would be "strapped down to a gurney and given the injection." <u>Sell</u> Hearing Tr., Vol. I (doc. no. 75) at 110. Because taking a pill is obviously less intrusive than an injection, the court sees no reasonwhy its order should not start there. Indeed, this was the proposal suggested for Pfeifer's case by his medical team at Butner. Therefore, the court's order will require Pfeifer to begin treatment with an oral dose of medication as prescribed by his medical team.

While his doctors have indicated that, thus far, Pfeifer has refused to consider any psychotropic medication, the court will still give Pfeifer the opportunity to comply on his own. If he does not take the medication as directed by his doctors, the court will authorize his medication by forced injection.

## 4. Whether Administration of the Drugs Is Medically Appropriate

Finally, the court must determine whether administration of the drugs as proposed is "in the patient's best medical interest in light of his medical condition." <u>Sell</u>, 181 U.S. at 539.

Pfeifer's medical team at Butner testified that it took Pfeifer's medical profile into account when developing its treatment plan and making recommendations. As the team explained, this meant that, because Pfeifer presented no exceptional, relevant medical issues and because the team was not aware of any prior mental-health treatment involving medication or sensitivity to any particular side effects, Pfeifer would be prescribed a medication regimen appropriate for a generic patient with delusional disorder who refuses voluntarily to take medication. While more research could certainly be done into Pfeifer's medical history, the court was not

29

made aware of any medical issue that should have been raised for his doctors' consideration or that would have altered their plan.

The potential side effects of the proposed medications, however, are quite serious. And in addition to those outlined above, there are, as with any drug, 'worst-case' scenarios. But the court has been given no indication that any of the more common side effects cannot be effectively managed or that the less common, extremely severe reactions would be more likely for someone with a medical profile such as Pfeifer's than for any other potential patient. Moreover, no doctor indicated in any way that the proposed treatment would in any way be adverse to Pfeifer's medical interests.

As such, the court finds that administration of the drugs is medically appropriate.


B. Pfeifer's Liberty Interests


30

The court ends with a comment about Pfeifer's liberty interests.

This court has wrestled with the government's request because, in part, it pits Pfeifer's liberty interest in avoiding the administration of antipsychotic drugs against his liberty interest in being free. <u>Cf</u>. <u>Foucha v. Louisiana</u>, 504 U.S. 71, 80 (1992) ("It is clear that commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection. We have always been careful not to minimize the importance and fundamental nature of the individual's right to liberty." (citations and internal quotation marks omitted)).

The court emphatically agrees that Pfeifer has an interest in maintaining and protecting his bodily integrity in a manner that is consistent with his own personal values. Though a defendant is mentally ill, he is not necessarily incapable of "mak[ing] up his own mind about treatment." <u>Sell</u>, 539 U.S. at 183. As the court has discussed previously, mental impairment

31

should be assessed along a continuum, and even a person who has been deemed incompetent to stand trial can maintain the capacity to make personal decisions as to his health and well-being. See Pfeifer, ____ F.Supp. 3d at ____, 2015 WL 4774875 at *4.

But being incompetent to proceed to trial means that Pfeifer is incompetent to make trial-related decisions. And this incompetence bears on his decision to privilege his desire to refuse medication over his ability to participate in this criminal proceeding. Indeed, because being incompetent for trial purposes means, in part, that Pfeifer cannot adequately weigh the risks of trial strategy or his likelihood of success, it could be said that his calculus is unreliable by definition. Cf. United States v. Gomes, 387 F.3d 157, 162 (2d Cir. 2004) (explaining that an incompetent defendant's "present choice of defense strategy" should not be given deference because it was "possibly delusional").

This concern is especially compelling here because of the substantial risk that Pfeifer will be detained indefinitely (perhaps for years, or even the rest of his life) if he is not medicated. And while being administered antipsychotic medication is not guaranteed to restore his competence such that he can proceed to trial, it provides his most realistic hope to avoid indefinite commitment.

If Pfeifer regains capacity to proceed to trial, he will face charges that have a maximum statutory limit of five years imprisonment, and a preliminary calculation of his likely Sentencing Guidelines range yields an advisory sentence of 24-30 months. If he were convicted, he would serve that sentence in prison (with any credit for time already served) and be released.

Pfeifer could also be acquitted at trial, and the defense has indicated its belief that he has a strong insanity defense. If Pfeifer were successful in that defense, he could be hospitalized on dangerousness

grounds by the State or the Bureau of Prisons.  See 18
U.S.C. § 4243.  But if it were determined that his
release would not create a risk for people or property
(which could indeed be the case after a successful
course of medication), he might be conditionally
released, subject to a prescribed regimen of medical,
psychiatric, or psychological care.  Id.

Alternatively, if Pfeifer is medicated but the
medication does not restore his competence, he will
remain in the same position, with respect to his
criminal charge, as he is now: not competent to proceed
to trial, and a candidate for indefinite
institutionalization on dangerousness grounds.

In short, in terms of his chances at living a life
outside of the walls of a prison, Pfeifer has much to
gain from being medicated.  While Pfeifer has a
fundamental liberty interest in being free of unwanted
antipsychotic medication, he also has a fundamental
liberty interest in being unconfined.  Indeed, this
latter interest was ultimately championed by his

34

guardian <u>ad litem</u>, who was appointed by the court to assess and represent Pfeifer's best interests after a close study of the case and repeated consultation with Pfeifer.

Thus, by its order, the court does not intend to minimize the significance of Pfeifer's constitutionally protected interest in being free of unwanted medication. Nor does the court seek to devalue Pfeifer's personal beliefs. The court orders medication only after coming to the firm conclusion that the government has met its legal burden. Moreover, having also considered Pfeifer's interest in being free from detention, the court is assured that this result produces the most just outcome in this case.

\* \* \*

Accordingly, it is ORDERED that:

(1) The government's request for a court order to involuntarily medicate defendant Deryke Matthew Pfeifer is granted.

(2) Defendant Pfeifer is committed to the custody of the Attorney General.

(3) The government shall proceed to treat defendant Pfeifer as outlined in the testimony of Drs. Carlton Pyant and Alton Williams at the _Sell_ hearing in this case and discussed above. The treatment protocol shall begin with encouragement that defendant Pfeifer agree to take oral medication voluntarily.

(4) If after a reasonable time, or after treatment has begun, defendant Pfeifer refuses to comply voluntarily, the government is authorized to administer the alternative, involuntary medication regimen of injections proposed by Drs. Pyant and Williams in their Forensic Evaluation (doc. no. 51) and at the _Sell_ hearing.

DONE, this the 14th day of October, 2015.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE